Filed 1/25/22 P. v. Yates CA4/2

*See concurring and dissenting opinion*


NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO


| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E075152 |
| v. | (Super.Ct.No. INF1800540) |
| DOUGLAS JOHN YATES, | OPINION |
| Defendant and Appellant. | |


APPEAL from the Superior Court of Riverside County. Steven G. Counelis, Judge. Affirmed in part; reversed in part with directions.

Steven S. Lubliner, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Michael Pulos and Britton B. Lacy, Deputy Attorneys General, for Plaintiff and Respondent.


1

On September 26 and 27, 2019, when defendant and appellant Douglas John Yates was not present, his trial proceeded, and a jury found him guilty of 20 counts of animal cruelty.[1]  (Pen. Code,[2] § 597, subd. (b).)  The trial court sentenced him to a total term of 14 years eight months and imposed various fines and fees.  He was ordered to serve five years eight months in county jail and was granted mandatory supervision for the remaining nine years of his sentence.  (§ 1170, subd. (h).)

On appeal, defendant contends the trial court violated his constitutional and statutory rights by denying his request for a continuance and proceeding with trial in his absence, and it erred by imposing $1,400 in court operations and facilities assessments after determining he was unable to pay other fees and fines.[3]  Defendant also charges his counsel with ineffective assistance by failing to argue for concurrent sentences.

We vacate defendant's sentence and remand for a new sentencing hearing. Otherwise, we affirm.

## I.  FACTS

On June 10, 2017, a search of defendant's storage unit at a facility in Palm Springs revealed several animal cages containing one dead cat and eight others in grave danger and various states of distress.  An animal control officer noted that the accumulation of

---

[1]  The court granted the People's motion to dismiss count 21.

[2]  All further statutory references are to the Penal Code unless otherwise indicated.

[3]  Defendant raised, but later withdrew, his contention that section 654 applied to stay the sentences on some of his convictions.  (*People v. Correa* (2012) 54 Cal.4th 331, 334 [§ 654 does not apply to multiple convictions under a single statute].)

2

feces in the litter was spilling into the kennels themselves, and opined that the feces had been there for days and days. The storage unit was not climate controlled, it had been rented by defendant on a month-to-month basis beginning May 11, 2017, and the activity log specific to defendant's gate code and access code showed access or activity on June 6, 7, 8, and 9 (three separate times).

On February 14, 2018, a search of defendant's U-Haul, parked in the back of a parking lot at a motel in Thousand Palms, revealed several crates or kennels containing 12 deceased dogs. Although there were bowls in the kennels, they appeared dirty, and none contained any food or water. There were bags of dog food, but no water, and there was no temperature control or ventilation. The investigating deputy sheriff opined that the dogs had not died recently and estimated that the kennels had been there for a week. He noted that the dogs had "very little movement" inside the kennels given their size and some of the kennels housed two or more dogs. Also, all of the kennels' doors were closed, so the dogs would not have been able to walk around inside the U-Haul.

## II. DISCUSSION

### A. Denial of Continuance and Trial in Defendant's Absence.

Defendant contends the "trial court violated [his] constitutional and statutory rights to be present at his trial and to testify in his own defense when, confronted with his need to go to the hospital to deal with a medical emergency, it denied a continuance and conducted the trial in his absence." We disagree.

3

### 1. *Further background information*

On July 26, 2019, defense counsel requested a "short continuance" of the trial to July 30 on the grounds defendant was "currently experiencing a medical issue, he's provided me a doctor's note and he's shown me the wristband from the hospital. He needs to go back to the hospital. [¶] And in his current state, I'm not able to have a meaningful conversation with the man about pleading guilty or going to trial, or anything about his case for that matter." The prosecutor objected based on a "concern that this appears to becoming a pattern, as we did have a failure to appear . . . because of a medical issue. And then now he's having a new medical issue." Defendant volunteered that it was the same issue. Acknowledging that some people experience medical issues that are "out of their control," the superior court granted the request and ordered defendant to provide specific documentation from a medical provider if a longer continuance was necessary.

During August 2019, the parties agreed to continue the trial to September 10 for reasons independent of defendant's health issue. Defense counsel also mentioned that defendant was still experiencing medical issues and had an appointment with a specialist during the last week in August. On September 10, both sides announced ready for trial; however, defense counsel informed the superior court that defendant's doctor recommended a postponement until September 16. The matter was continued.

On Monday, September 16, 2019, defense counsel announced ready for trial but relayed defendant's request for a two-week continuance based on his doctors' recommendations. According to defendant, "he has medical appointments Thursday," when he will be told whether he needs to have surgery. Defense counsel also informed

4

the court that defendant wished to have "different counsel." While the prosecutor was skeptical as to whether defendant's condition prevented "him from going to trial versus inhibiting his daily life," the superior court continued the trial to September 20 and ordered defense counsel to bring "a letter from the doctor explaining whether there's going to be a surgery [or not,] why [defendant] cannot attend trial, what the estimated time is, and what is going to happen if he does." Although the court agreed with the prosecutor that the matter "does need to go to trial if [defendant's medical issue is] not going to resolve," it refused to ignore defendant's medical issues.

On September 20, 2019, defense counsel announced ready for trial but stated that defendant "has been indicating . . . that he's suffering from a life-threatening condition, [and] that further documentation will be arriving . . . sometime today." The superior court noted that defendant had been provided the opportunity to present documentation; however, what was provided "was wholly inadequate" because it only indicated that defendant "has some medical issues, but nothing . . . indicating the degree of seriousness or life-threatening," as alluded to by counsel. Trial was set for Monday, September 23, 2019.

On September 23, 2019, defendant was present when his trial began. Counsel conducted a "pretrial conference regarding the mechanics of the logistics of the trial." After informing defendant that jury selection would begin the next day, the trial court ordered defendant to return at 1:15 p.m. on September 24. Neither defense counsel nor defendant raised any issue involving defendant's health. On September 24, defendant was late for court. After the court instructed him on the importance of being on time,

5

defense counsel offered a doctor's note, which advised "a temporary delay in the court proceeding until a study is completed." Because the note did not say it was "urgent that [defendant] need[ed] to be hospitalized," counsel indicated he would contact the doctor for "additional information." Observing that the trial had "begun in earnest," requiring "greater scrutiny" of the request, the court found insufficient evidence of good cause to continue the trial absent "details of [defendant's] condition and the risks of proceeding forward, the nature of the testing, [and] the urgency of the medical matter."

On September 25, 2019, defense counsel said he had not heard from defendant's doctor, and he did not have enough information to request a continuance. Counsel, however, noted that defendant had been falling asleep during voir dire, and defendant attributed this to medication he was taking. Defendant's wife informed the trial court that the hospital had "faxed" a letter to defense counsel's office. No evidence of defendant's medical condition was introduced at the hearing.

On September 26, 2019, a letter from defendant's internist, was read into the record: "'[I]n regards to [defendant]. . . . Due to his complaints of chest pain and underlying history of coronary artery disease, I need to assess the risk for another heart attack. His clinical presentation is atypical. His EKG shows no indication of acute ischemia, . . . and his blood pressure and lipid panel are optimized on medical therapy. His pre-test probability of significant ischemia is low to intermediate probability. Therefore, I am ordering a nuclear medicine scan. If this scan is negative, he could proceed with his court engagement.'" Defendant added that he would be undergoing a stress test, and he had been taking "upwards of five to seven" nitroglycerin tablets a day

6

for the past week and a half because he was unable to walk "from here to the parking structure across the street without having severe chest pain." He was unable to provide documentation from a cardiologist because his doctor had retired.

Defense counsel did not request a continuance because defendant's heart attack risk was "low intermediate at best," which did not require immediate intervention, and the court had already sworn in the jury. Counsel thus deferred to defendant, who explained his history with heart blockages, heart attacks, and stent insertions, and requested a continuance to October 7, 2019, so he would have sufficient time to complete the testing. Defendant also stated: "The other option, which my doctor told me yesterday, was after I left here, was just to go to check into emergency," but defendant had not done that because he did not "want to be in contempt of court and have [his] bond revoked." The trial court was confronted with the following: On one hand, the jury had been empaneled and counsel were ready to make opening statements. On the other, defendant had no scheduled tests for one week, and there was no medical opinion advising the court if the matter should be curtailed or ceased. The court expressed concern that defendant was "putting [him] in a position of evaluating and interpreting [defendant's] subjective symptoms," when he had no "knowledge or expertise to say that what [defendant is] experiencing is something which is . . . a good cause reason to continue the trial." Ultimately, defendant's request was denied because the trial would not "interfere with [defendant's] anticipated medical care, testing, or otherwise," and there was no medical emergency.

After conferring with defendant, counsel announced that defendant had elected to go to a hospital emergency room "at this moment." The prosecutor asked that the trial proceed "in absentia" of defendant because the case had been pending a long time, defendant had not provided the information about the state of his heart and his use of nitroglycerin pills when the case was sent out to trial, the case would likely only take one day of evidence, it appeared that defendant was well enough to sit in court, and it was defendant who "want[ed] to willfully absent himself, . . . not a recommendation of the doctor." The prosecutor accused defendant of "gamesmanship."

Understanding that defendant would not be testifying, the trial court asked if he would waive his right to be present; he declined. Defendant claimed ignorance of his counsel's plan to not call him or other witnesses to testify and indicated he wanted to retain "a private attorney, because [his attorney was] not representing [him]." Reiterating the "competing interests" (the stage of the trial versus defendant's health), the court stated: "I can accommodate all of those interests that are vitally important to each side, [by telling] you that you're welcome to go and allow the trial to proceed in your absence. And so that's . . . my proposed solution, because I think that's the fair thing to do for both sides." When the court asked defendant what he wanted, defendant replied, "I need to go to the hospital. It's whatever you want. I don't want to miss the proceedings, but at this point I need to. It's not a matter of wanting to, it's I need to." After adding that he

wanted to testify in his trial, the court held a *Marsden*[4] hearing,[5] and defendant remained in the courtroom.

Following the *Marsden* hearing, defendant confirmed that he would be leaving for "emergency medical care." The trial court responded: "[S]ince the defendant does not wish to enter any waivers, I will find that he is absenting himself from the courtroom in order to seek emergency medical care, and the trial will continue in his absence." The court informed defendant that he was welcome to return to the courtroom any time. Defense counsel reiterated defendant's desire to testify, but all sides acknowledged that his right to testify was not an independent basis for continuing the trial. The court advised defendant to remain in contact with his attorney, who could advise him about returning to court to testify. After a brief recess, the court noted defendant was not present and again found that he "voluntarily absented himself from the proceedings."

---

[4] *People v. Marsden* (1970) 2 Cal.3d 118, 123 (*Marsden*).

[5] Defendant faulted his counsel for "sitting on evidence that shows" motel management denied him access to his dogs and kept them "locked up in a room with no air conditioning, no water, no food for four days," over their dispute of his bill. The police were called and defendant claims that he was ordered to put the dogs in the unventilated U-Haul in hot weather. In response, defense counsel stated that his investigation showed that the motel management had called the police out of concern for the dogs, and the responding officer's report states that the dogs were let out and given food and water. It does not state that defendant was ordered to put his dogs in the U-Haul. Defense counsel opined that because defendant had not called the police for help in retrieving his dogs, the evidence does not support his story. Nonetheless, defendant insisted his son and a second responding officer could corroborate defendant's claims. Defense counsel said he had sent an investigator to locate and interview witnesses, but defense counsel had no recollection of defendant mentioning his son being present. Ultimately, defense counsel and defendant agreed that their relationship was not irretrievably broken, and the motion was denied.

9

The trial continued with opening statements and the presentation of evidence. At the end of the day, the prosecution rested. Outside the presence of the jury, the trial court confirmed that defense counsel would contact defendant to "let him know that he [was] welcome to return . . . to the courtroom if he wishe[d] to offer his testimony."

On September 27, 2019, defense counsel informed the trial court that he had received an e-mail, which indicated defendant had been admitted to a hospital for chest pain and other health issues; however, no documentation was provided to confirm this or indicate when he would return to court. The trial proceeded with defendant "in absentia," and the court issued, but held, a bench warrant in the amount of $10,000 until September 30. Defense counsel requested a continuance to preserve defendant's right to testify. The prosecutor opposed the request. For the same reasons previously given, the court found no good cause to grant the request. The jury was instructed not to factor defendant's presence or absence into its deliberations.

Following the jury's verdicts, the trial court ordered defendant to appear on September 30, 2019. If he was unable to appear, the court required "a corroboration form, medical records, hospital records, and the like to explain why he's absent." Defendant failed to appear. Defense counsel stated that he had communicated with defendant over the weekend; however, counsel did not receive any documentation evidencing defendant's hospitalization, if defendant would be present in court, or if defendant was still hospitalized. Rather, counsel stated that he had received an e-mail from defendant, which he kept confidential, and asked the court to continue to hold the

warrant. The court issued a no bail warrant with the understanding that it would consider mitigating factors at a later date.

On March 18, 2020, defendant appeared in custody with his counsel, and the trial court set bail at $50,000. A sentencing hearing was held on May 26, 2020. At sentencing, defense counsel offered no information about defendant's absence in September 2019; however, he stated that defendant had been diagnosed with congestive heart failure, had undergone surgery in January 2020 to place a stent inside one of his arteries, and continued to suffer from other medical conditions including an open wound from a preexisting umbilical hernia and weakness with breathing. Counsel noted that defendant was "receiving treatment."

### 2. *Applicable legal principles.*

"A criminal defendant's right to be personally present at trial is guaranteed under the federal Constitution by the confrontation clause of the Sixth Amendment and the due process clause of the Fourteenth Amendment. It is also required by section 15 of article I of the California Constitution and by [Penal Code] sections 977 and 1043." (*People v. Concepcion* (2008) 45 Cal.4th 77, 81.) If a defendant is unable to be present at his trial, he may request a continuance; however, "[c]ontinuances shall be granted only upon a showing of good cause." (§ 1050, subd. (e); see Cal. Rules of Court, rule 4.113 ["Motions to continue the trial of a criminal case are disfavored and will be denied unless the moving party . . . presents affirmative proof in open court that the ends of justice require a continuance."].) "'The grant or denial of a motion for a continuance rests within the sound discretion of the trial judge [citations]. . . . Discretion is abused only

11

when the court exceeds the bounds of reason, all circumstances being considered. [Citation.]' [Citation.] 'In deciding whether the denial of a continuance was so arbitrary as to violate due process, the reviewing court looks to the circumstances of each case, "'particularly in the reasons presented to the trial judge at the time the request [was] denied.'"'" (*People v. Froehlig* (1991) 1 Cal.App.4th 260, 265.)

When, as here, the trial court decides not to continue the trial, the defendant may, by his actions, consent to the trial proceeding in his absence and thus lose his constitutional right to be present. (*People v. Gutierrez* (2003) 29 Cal.4th 1196, 1202 (*Gutierrez*).) "'"[I]f a defendant at liberty remains away during his trial the court may proceed provided it is clearly established that his absence is voluntary. He must be aware of the processes taking place, of his right and of his obligation to be present, and he must have no sound reason for remaining away."'" (*People v. Espinoza* (2016) 1 Cal.5th 61, 73-74 (*Espinoza*).) "No more [is] constitutionally required." (*Id*. at p. 74.) More specifically, after a noncapital felony trial has commenced in defendant's presence, his voluntary absence "shall not prevent continuing the trial to, and including, the return of the verdict." (§ 1043, subd. (b); see *People v. Molina* (1976) 55 Cal.App.3d 173, 177 [Trial "commence[s]" for purposes of section 1043 when either (1) the jury is impaneled and sworn or (2) the first witness is sworn or the first exhibit is admitted into

evidence.].)[6] Pursuant to section 1043, a defendant is prevented from "intentionally frustrating the orderly processes of his trial by voluntarily absenting himself. A crucial question must always be, 'Why is the defendant absent?' This question can rarely be answered at the time the court must determine whether the trial should proceed. Consequently, . . . it must be recognized that the court's initial determination is not conclusive in that, upon the subsequent appearance of the defendant, additional information may be presented which either affirms the initial decision of the court or demands that defendant be given a new trial. It is the totality of the record that must be reviewed in determining whether the absence was voluntary." (*People v. Connolly* (1973) 36 Cal.App.3d 379, 384-385; see *Espinoza*, *supra*, 1 Cal.5th at p. 72 ["'In determining whether a defendant is absent voluntarily, a court must look at the "totality of the facts."'"].) We will affirm this finding if it is supported by substantial evidence. (*Espinoza*, at p. 74.)

---

[6] Section 977, subdivision (b)(1), in relevant part, provides that, with certain exceptions, "in all cases in which a felony is charged, the accused shall be personally present . . . during those portions of the trial when evidence is taken before the trier of fact, and at the time of the imposition of sentence. The accused shall be personally present at all other proceedings unless he or she shall, with leave of court, execute in open court, a written waiver of his or her right to be personally present . . . ." However, the California Supreme Court has decided that "subdivision (b)(1)'s presence requirement does not preclude a defendant from being '*voluntarily absent*' during the taking of evidence under section 1043, subdivision (b)(2)." (*Gutierrez*, *supra*, 29 Cal.4th at p. 1203, italics added.) "[W]hen a trial has commenced in a defendant's presence, section 1043 applies." (*Ibid.*) Thus, in considering whether defendant voluntarily absented himself and waived his statutory right to be present during trial, we focus on whether he was voluntarily absent under section 1043, rather than whether he was required to be present under section 977.

*3. Analysis.*

Defendant requested and was granted continuances of his trial for medical reasons on July 26, September 10, and September 16, 2019. When he appeared on September 23, the start of his trial, neither he nor his counsel raised any issue involving defendant's health. On the next day, defense counsel presented a doctor's note, which advised "a temporary delay in the court proceeding," without stating an urgent need for defendant to be hospitalized. On September 25, defense counsel had no further information on defendant's health, and no request for a continuance was made. On September 26, a letter from defendant's internist indicated defendant's "EKG shows no indication of acute ischemia," "pre-test probability of significant ischemia is low to intermediate probability," and a "nuclear medicine scan" was ordered. Because defense counsel did not believe he had sufficient evidence of good cause to request a continuance, he deferred to defendant, who requested a continuance to Monday, October 7, so he could undergo a procedure scheduled for Thursday, October 3. Alternatively, defendant stated that his doctor told him he could just "check into emergency." Denying defendant's request, the trial court observed that the trial would not "interfere with [defendant's] anticipated medical care, testing, or otherwise." Given the circumstances of this case, we conclude defendant has not established that the trial court abused its discretion in finding no good cause for another continuance.

Notwithstanding *ante*, defendant argues that the trial court's ruling "resulted in [him] being tried *in absentia* in violation of his constitutional and statutory rights to be present at trial." Not so. The court undertook reasonable steps to ascertain that

14

defendant was voluntarily absenting himself before continuing the trial in his absence, and the totality of the record supports the court's decision. Again, there was no medical opinion indicating an urgent need for defendant to be hospitalized, and his tests were scheduled for a week later. Nonetheless, he decided to take himself to a hospital's emergency room. His absence was not occasioned by circumstances that were fortuitous or beyond his control; rather, it was voluntarily imposed. The evidence that he initially presented to the court—a note from his internist—failed to prescribe immediate hospitalization sufficient to contradict a finding that he had voluntarily absented himself from his trial. More importantly, he failed to present any documentation that confirmed the urgent need to address his medical condition or explained what actions were taken to address his medical emergency. We, therefore, conclude that the court properly found that defendant, "by words and conduct, . . . waived his right to be present voluntarily and with full knowledge that the trial was continuing without his presence." (*People v. Lewis* (1983) 144 Cal.App.3d 267, 279; see *People v. Rogers* (1957) 150 Cal.App.2d 403, 415 ["The defendant, by his own actions, induced the condition existing [on the third] day of the trial. This amounted to a waiver of the right to be . . . present granted by section 1043 of the Penal Code. If this were not the rule, many persons, by their own acts, could effectively prevent themselves from ever being tried. A diabetic can put himself in insulin shock by simply taking insulin and then not eating, or by refusing to eat, or can disable himself by failing to take insulin."].)

"Of course, our conclusion that defendant's voluntary absence operated to waive his constitutional right to be present at trial and permitted continuation of the trial does

15

not end our inquiry regarding the propriety of the trial court's decision to proceed with the trial in the absence of defendant and defense counsel. Section 1043[, subdivision] (b)(2) states that a defendant's voluntary absence 'shall not prevent' the trial from continuing, but it does not require it. Accordingly, the decision whether to continue with a trial in absentia under the statute . . . rests within the discretion of the trial court." (*Espinoza*, *supra*, 1 Cal.5th at pp. 75-76.) We, therefore, consider whether the trial court abused its discretion in proceeding with the trial.

Defendant contends that his "presence at trial necessarily would have assisted his defense as he could have consulted with defense counsel about cross-examination of witnesses such as [the deputy], who testified about discovery of the dogs in [defendant's] presence, and . . . the storage facility manager, who testified about business dealings with [defendant]." Defendant adds that he "would have testified to the defense he mentioned in the *Marsden* hearing that a dispute with the motel [management] led to his dogs being confined for days to their detriment, and he was later forced by an officer to put them on a U-Haul, where they quickly died. It is also reasonable to think he would have testified about the cat incident." We agree with the People that these contentions are "speculative and unavailing."

At the time the trial court decided to proceed with the trial, it knew about defendant's claims regarding how the dogs came to be in the U-Haul, along with defense counsel's reasons for dismissing them. Assuming defendant had been forced, initially, to put his dogs in the U-Haul, he offered no explanation why they remained there. As defense counsel stated at the *Marsden* hearing, defendant's version of this event is neither

16

believable nor sufficient to refute the animal cruelty charges filed against him. More importantly, if defendant chose to testify, he could have been impeached with his prior conviction for animal cruelty, and he could not have offered any words to negate the extensive graphic and damning photographs of the conditions of his dogs and cats, who were confined in cages in either a storage unit or U-Haul, with no accessible food, water, or ventilation. In short, there is no reason to believe defendant had any legitimate defense to the charges that required his presence.

Because we find that the trial court properly concluded that "defendant was 'voluntarily absent' [citation], and it properly continued with trial in his absence, we [need] not reach the question whether defendant's absence was prejudicial." (*Gutierrez, supra*, 29 Cal.4th at p. 1209.)

### B. Ineffective Assistance of Counsel

At the sentencing hearing, defense counsel argued for probation only. His failure to raise the issue of consecutive versus concurrent sentencing forfeited the issue. (*People v. Scott* (1994) 9 Cal.4th 331, 355-356.) However, defendant contends that if counsel's silence constituted forfeiture, then he received ineffective assistance.[7] His claim has merit.

---

[7] Defendant also filed a petition for writ of habeas corpus on this issue (*In re Yates*, E076680), which we ordered considered with this appeal. Although we will resolve that petition by separate order, given the nature of this issue—ineffective assistance of counsel—defense counsel's declaration filed in support of the petition is relevant to our consideration of defendant's claim.

Defendant is guaranteed the right to effective assistance of counsel by the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution. (*People v. Lucas* (1995) 12 Cal.4th 415, 436.) A cognizable claim of ineffective assistance of counsel requires a showing that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." (*Strickland v. Washington* (1984) 466 U.S. 668, 687.) "[T]he performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." (*Id.* at p. 688.) To prevail on an ineffective assistance of counsel claim, a defendant must also establish counsel's performance prejudiced his or her defense. (*Id.* at p. 687.) "'Whether counsel's performance was deficient, and whether any deficiency prejudiced defendant, are mixed questions of law and fact subject to our independent review.' [Citation.] [¶] 'Usually, "ineffective assistance [of counsel claims are] more appropriately decided in a habeas corpus proceeding."' [Citation.] On direct appeal, 'we may reverse "only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation."'" (*People .v Henderson* (2020) 54 Cal.App.5th 612, 617-618.)

Here, defendant observes that concurrent sentences are common in animal cruelty cases and asserts that his sentence is longer than the upper terms for many serious and violent crimes against people, including forcible rape of a child under 14 years of age (§ 264, subd. (c)(1) [13 years]), voluntary manslaughter (§ 193, subd. (a) [11 years]), and home invasion robbery (§ 213, subd. (a)(1)(A) [9 years]). He further contends that his

actions involving the dogs were part of an indivisible course of conduct, and the same is true for his actions involving the cats. Thus, he argues his counsel could not have had any conceivable tactical purpose for failing to argue for concurrent sentences since (1) the argument would not have undermined his request for probation, (2) the "case law shows that animal cruelty cases are not punished as harshly as cases involving multiple human victims," and (3) "neither the position of the probation officer nor the known hard line of the prosecutor could have justified abandoning such a strong sentencing position." While we do not agree with defendant's disproportional sentence assertion, we find merit in his claim of ineffective assistance of counsel for failing to argue for concurrent sentences.

The probation officer recommended that (1) probation be denied, and (2) defendant be sentenced to 14 years eight months, serving five years eight months in county jail (§ 1170, subd. (h)) and the remaining nine years on mandatory supervision. At sentencing, the prosecutor agreed with this recommendation. Defense counsel focused his argument exclusively on persuading the trial court to grant probation because defendant's chronic health issues (congestive heart failure) made him vulnerable if he were to be held in custody during the ongoing pandemic, and that his actions toward the animals (deprivation of adequate shelter and food) fell within the lesser category of

animal cruelty recognized by the law.**8**  Counsel argued that defendant's actions, also

known as animal hoarding, were due to an underlying mental disorder (recognized by

both Dr. Jones and the American Society for the Protection of Cruelty to Animals

(ASPCA)), which require counseling and the prohibition of having animals, not jail

time.**9**  Defense counsel referenced Dr. Jones' report because prior counsel had defendant

evaluated for an underlying mental health issue.  As a result of this evaluation, Dr. Jones

opined that defendant suffered from attachment disorder and PTSD due to the death of

his father when he was 14 years old.  The report explains why defendant held onto the

---

**8**  "[W]hen we're dealing with animal cruelty, there are two broad categories of people that inflict cruelty on animals.  The first and the most heinous or more heinous are those that purposely wound, attack, maim, mutilate, or otherwise violently hurt animals. We're talking about people who torture cats [or] engage in dog fighting. . . .  Then there's a second category or lesser category recognized by the law.  [There are sections] 597(a) and 597(b).  [Defendant] has been convicted of that lesser category, which is the deprivation of subsequent or necessary or adequate shelter and/or food."

**9**  "[T]he ASPCA recognizes this type of behavior, also known as animal hoarding, [as] a mental disorder, [which is defined as] possessing more than the typical number of animals.  We're talking 20 dogs and cats here.  The individual is unable to provide nutrition, sanitation, shelter.  This neglect often results in illness and death to the animals.  Additionally, the individual himself is in denial that he is suffering from this type of condition . . . .  Furthermore, they recognize that people that engage in this type of hoarding suffer from attachment disorders or other mental illnesses, and that's been documented . . . .  [¶]  And what they recommend . . . is that prosecution isn't the best answer because there's often an emotionally troubled individual, not a criminally inclined individual, and that counseling and the prohibition of having animals may help, but that prosecution and jail time will not.  Additionally, . . . that's why Penal Code [section] 597(g) recognizes if someone is granted probation, they are prohibited from having animals.  Additionally, 597(h) mandates that any person convicted of this type of crime receive counseling.  And I see that in the probation report whether it be titled mandatory supervision terms or probation terms, both of those terms would be included."

20

carcasses of his dead dogs.[10] Defense counsel offered no comment on consecutive versus concurrent sentences.

In response, the prosecutor asserted that he filed this case under section 597, subdivision (d), because it "allows for more theories of liability," and it was unclear whether the dogs had suffocated, died of heat or starvation. Regarding the claim that animal hoarding was ultimately an underlying medical issue, the prosecutor compared that to the FBI study in the early '70s, which found that on top of fire starting, cruelty to animals is perhaps the only red flag of homicidal behavior, truly convincing of sociopathic tendencies. Noting defendant's prior conviction for animal cruelty, the

---

[10] Dr. Jones's report "was done early because this type of case isn't something that's common. It's odd behavior. Theft is fairly common. Domestic violence is very common. DUIs are very common. I think although we don't condone that type of behavior, we can understand why people do those kinds of things or why people might [do them]. However, this behavior is . . . so removed from the standards and norms of society that I believe his defense at the time suspected some type of underlying mental illness. [¶] Dr. Jones was able to suss out that [defendant] suffered a traumatic loss when he was 14 of the only father figure in his life, his adoptive father. And even prior to that, [defendant] didn't really know his biological family. And so Dr. Jones is saying that and as the ASPCA recognizes, when someone suffers a traumatic loss, they're afraid to let anything go, even though it might be a dead dog carcass. [¶] . . . [W]hen the police encountered the U-Haul . . . these dogs had been long dead . . . yet, [defendant] held onto them for some reason. . . . He's got attachment disorder because all he has known in his life . . . is such loss that he can't even bear to let go of the carcasses of these dogs. That is the nexus between his emotional deficiency, the mental suffering, and the condition recognized by the ASPCA. [¶] Dr. Jones . . . recognizes . . . in addition to major depression, [defendant] suffers from PTSD relating to the death of his father when he was 14. He acts with intense distress in situations that symbolize or resemble this type of loss such as a threat of the loss of dogs. So even though he can't care for them, he is not able to feed them or bathe them or properly shelter them, he can't let them go because of his emotional deficiency."

21

prosecutor argued that defendant will reoffend and, thus, granting probation would not serve justice.

In sentencing defendant, the trial court began by addressing defense counsel's sole request for probation, concluding that defendant was not suitable for probation.[11] The court then discussed the criteria that affect defendant's sentence, including the aggravating factors (number of vulnerable victims, planning and forethought, defendant took advantage of "a position of trust or confidence with respect to the animals in his care," and prior misdemeanor conviction for the same crime) and the mitigating factors (defendant suffers from a mental disease or disorder, the convictions are nonserious, nonviolent, and nonregisterable, and defendant is subject to § 1170, subd. (h)). Without considering or discussing concurrent sentencing, the court adopted the probation officer's "recommendation as to punishment with respect to each of the counts."

By arguing for probation, defense counsel failed to advance all of the arguments for leniency. Specifically, case law supports concurrent sentencing on multiple convictions of animal cruelty. (*People v. Sanchez* (2001) 94 Cal.App.4th 622, 627, 630,

---

[11] "[There are] no statutory provisions limiting or prohibiting a grant of probation pursuant to Rules of Court 4.413. The question is whether or not . . . defendant is suitable for probation. In evaluating Rules of Court that support a grant of probation, and those in support of the denial of probation under 4.414, I'm adopting the analysis that is presented by the Probation Department that there are no factors relating to the crime in support of the grant of probation. And there are just two factors related to the defendant, that being 4.414(b)(4) and 4.414(b)(6). [¶] With respect to the Rules of Court that support a denial of probation under 4.414(a), factors which point to denial include (a)(1), (a)(3), (a)(4), (a)(6), (a)(8), and (a)(9). And factors that relate to the defendant in this regard are 4.414(b)(8). So, on whole, I conclude that the defendant is not suitable for probation and probation is denied."

22

634 [defendant convicted of seven counts of animal cruelty (count 2 (rabbits), count 3 (ducks), count 4 (chickens), count 5 (geese), count 7 (dogs), count 8 (calves) and count 11 (puppy)) was sentenced to two years on one of those counts with the remaining two-year terms on each count imposed concurrently].)  Moreover, California Rules of Court, rule 4.425(a) sets forth the factors affecting the decision to impose consecutive rather than concurrent sentences, and they include the following facts relating to the crimes:  "(1) The crimes and their objectives were predominantly independent of each other; [¶] (2) The crimes involved separate acts of violence or threats of violence; or [¶] (3) The crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior."

Here, defendant's convictions did not comprise 20 separate acts of animal cruelty. Rather, they were based on two separate acts of neglect, one involving 12 dogs and the other involving eight cats.  Each of the 12 counts involving dogs were based on an identical allegation:  "on or about 2/14/2018, . . . defendant . . . did willfully and unlawfully subject such animal to needless suffering, and inflict unnecessary cruelty upon such animal, and abuse such animal, and fail to provide such animal with proper food, drink, shelter, and protection from the weather."  Each of the eight counts involving cats were based on a similar identical allegation:  "on or about 6/10/2017, . . . defendant . . . did willfully and unlawfully subject such animal to needless suffering, and inflict unnecessary cruelty upon such animal, and abuse such animal, and fail to provide such animal with proper food, drink, shelter, and protection from the weather."  According to

23

the evidence, defendant confined all 12 dogs in a U-Haul and all eight cats in a storage unit, and he failed to provide adequate food, water, and shelter, causing them to deteriorate and die. Thus, their weakened states and deaths were caused by defendant's continuous course of neglect rather than multiple specific and individual acts of abuse. While the circumstances were cruel and appalling, the evidence necessarily suggests an indivisible course of neglect—defendant's failure to feed and care for his animals.

Moreover, defense counsel's failure to argue for concurrent sentencing was compounded by his subsequent failure to contest the imposition of 20 consecutive sentences. According to Dr. Jones, defendant suffers from a mental disease (attachment disorder) caused by the loss of his father when he was 14 years old, and the recommended means of addressing this affliction is counseling, not jail time. Because the trial court acknowledged defendant's mental disorder as a mitigating factor, we can think of no tactical reason for counsel's failure to challenge the imposition of consecutive sentencing by arguing for concurrent sentencing. He had nothing to lose by arguing for concurrent sentencing, which if successful would have reduced defendant's aggregate term significantly.[12] Thus, counsel's performance fell below professional norms. Considering the nature of the charged offenses, defendant's circumstances, and the fact that the trial court was never asked to consider—nor did it discuss—the possibility of running the sentences on defendant's convictions concurrently, we conclude it is

---

[12] In fact, defense counsel's declaration in support of defendant's petition for writ of habeas corpus admits his mistake: "It was a mistake not to present arguments to the court for concurrent sentences . . . so that [defendant] might have received a substantially lower sentence."

reasonably likely defendant would have obtained a better outcome but for counsel's failings. Because counsel's substandard performance prejudiced defendant, we vacate the trial court's sentence and remand for a new sentencing hearing.

### C. Imposition of Fines and Fees.

At sentencing, defendant was ordered to pay an $800 court operations assessment (Pen. Code, § 1465.8), a $600 court facilities assessment (Gov. Code, § 70373), a $514.58 booking fee (Gov. Code, § 29550), and a $5,000 restitution fine (Pen. Code, § 1202.4). When defense counsel objected to the imposition of these fines and fees on the grounds defendant lacked the ability to pay, the trial court struck the booking fee and reduced the restitution fine to $300; however, it did not strike the two assessments because they "are not subject to an ability to pay analysis."

Defendant argues the imposition of the court operations and facilities assessments, despite the trial court's finding that he lacked the ability to pay a booking fee, denied him due process under the federal and state Constitutions. In support, he relies primarily on *People v. Dueñas* (2019) 30 Cal.App.5th 1157, 1164, 1167, which held that "due process of law requires the trial court to conduct an ability to pay hearing and ascertain a defendant's present ability to pay" (*id.* at p. 1164) before it imposes any fines or fees. He asks that we correct the court's error and strike the assessments. The People concede the imposition of the $1,400 in assessments was "seemingly based only on [the court's] belief that their imposition was not subject to an ability to pay analysis." However, they assert remand is appropriate to allow the court to "make the necessary findings regarding defendant's ability to pay 'and weigh the relevant factors in the first instance.'" Because

we are vacating defendant's sentence and remanding for a new sentencing hearing, we agree that the court should make the necessary findings regarding defendant's ability to pay.

### III. DISPOSITION

Defendant's sentence is vacated, and the matter is remanded to the trial court to conduct a new sentencing hearing in accordance with the views expressed in this opinion. Following the new sentencing hearing, the clerk of the superior court is directed to prepare a minute order of the new sentencing hearing and a new abstract of judgment reflecting defendant's sentence, and to forward a certified copy to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

McKINSTER
                                                    Acting P. J.

I concur:


FIELDS
                    J.

26

[*P. v. Yates*, E075152]

MENETREZ, J., Concurring and Dissenting.

The majority opinion concludes that defense counsel rendered ineffective assistance by failing to request concurrent sentences. I respectfully dissent because there is no reasonable probability that defendant Douglas John Yates would have received a more favorable sentence in the absence of counsel's alleged dereliction. (*People v. Sepulveda* (2020) 47 Cal.App.5th 291, 301 [ineffective assistance of counsel constitutes reversible error only if "there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant"]; *Strickland v. Washington* (1984) 466 U.S. 668, 687-692.)

Yates was convicted of 20 felony counts of animal cruelty under Penal Code section 597, subdivision (b) (undesignated statutory references are to this code). He locked eight cats in cages in a storage unit and starved them; one cat died, and the other seven were on the brink of death when rescued. Eight months later, he locked 12 dogs in kennels in a U-Haul trailer and starved them to death. Access logs and surveillance footage showed that Yates visited the storage unit on each of the four days before the cats were discovered. The U-Haul contained bags of dog food, inaccessible to the dogs who were starving to death in cages in the same trailer. The evidence as a whole thus showed that Yates (who had a prior conviction for misdemeanor animal cruelty) was aware of the animals' deteriorating condition, had the means to feed them, and knew exactly what he was doing when he starved them. This was not mere oversight or neglect. And the

1

probation officer reported that while out on bail with these charges pending, Yates was arrested on charges of animal cruelty against another 50 animals.

The probation officer found no circumstances in mitigation but multiple circumstances in aggravation, including that the victims were particularly vulnerable, the manner of the crimes indicated planning, Yates took advantage of a position of trust or confidence, and Yates's criminal conduct is of increasing seriousness. The probation officer recommended the mid-term of 2 years on the base count and consecutive sentences of 8 months (one-third of the mid-term) on each of the 19 subordinate counts, for an aggregate sentence of 14 years and 8 months. But the probation officer also recommended that Yates serve the first 5 years and 8 months in county jail and the remaining 9 years on mandatory supervision under subdivision (h) of section 1170.

In a sentencing brief and orally at the sentencing hearing, defense counsel vigorously argued that Yates should be granted probation. Counsel argued that Yates has several medical conditions that would put him at particular risk of harm if incarcerated, especially because of the COVID-19 pandemic. Counsel also argued that Yates "suffers from a psychiatric condition known as 'animal hoarding'" and other mental disorders. In support of that argument, counsel introduced the report of a clinical psychologist, Dr. William H. Jones, in which Dr. Jones diagnosed Yates with major depression and posttraumatic stress disorder. Counsel argued that Yates's mistreatment of animals was the result of all of those mental conditions and that Yates accordingly should be granted probation because he needed treatment, not incarceration.

Contrary to the probation officer's report, the court found at least one mitigating circumstance, namely, that Yates suffers from a mental disease or disorder not amounting to a legal defense. But the court agreed with the probation officer about the aggravating circumstances, and the court denied probation and imposed the recommended sentence of 14 years and 8 months, with 5 years and 8 months to be served in county jail and the remaining 9 years on mandatory supervision under subdivision (h) of section 1170.

Defense counsel did not mention concurrent sentences as an alternative to probation, but on this record there is no reasonable probability that the court would have imposed a shorter sentence if he had. The court sentenced Yates to only 5 years and 8 months of incarceration for 20 felonies with multiple aggravating circumstances. Yates will serve the rest of his sentence on mandatory supervision, during which he can get the treatment that counsel argued Yates needs. Nothing in the record supports a more lenient sentence or suggests the court would have imposed one if only defense counsel had uttered the magic words, "concurrent sentences." On the contrary, defense counsel forcefully made the case for leniency. Counsel presented every relevant consideration in support of granting probation, and each of them weighed equally in favor of imposing as brief a period of incarceration as possible. And counsel actually showed creativity and skill in marshalling the little evidence that was on his side. Dr. Jones's report, for example, is of almost no probative value because Yates, when interviewed by Dr. Jones, completely misrepresented the facts of the charged offenses, claiming only that some of

3

his beloved dogs were malnourished and dehydrated because a motel owner had neglected them against Yates's will.[1]

The majority opinion's prejudice analysis consists of one sentence: "Considering the nature of the charged offenses, defendant's circumstances, and the fact that the trial court was never asked to consider—nor did it discuss—the possibility of running the sentences on defendant's convictions concurrently, we conclude it is reasonably likely

---

[1] Dr. Jones's report says that Yates gave the following account of the present charges: "Mr. Yates stated that he was trying to rent a house in Blythe. For some reason, he was being evicted and moved to a motel. He rented a truck to move his belongings out of the house and into storage. He kept the rental truck for his dogs to stay in, and he had it for one month. His wife was to be living in Blythe with him, but she was not present when the events occurred that led to Mr. Yates' arrest. Mr. Yates stated that he was planning to rent another house. For reasons that were not clear, Mr. Yates stated that he and his wife continued to work in the Coachella Valley area, but were looking for housing in Blythe. Mr. Yates stated that he raised Great Danes. He had sold some to other people, but they were not able to keep the large dogs and returned them. Thus, he had more dogs than he meant to have. He described himself as an intense dog lover and began to cry as he was expressing this. When his wife was there, they had rented two motel rooms to spread the number of dogs into a larger space. Mr. Yates left the dogs in the motel rooms when he was gone. He reported that the motel owner then charged them $25 per day per dog, which came to a total of about $2,000. He stated he was not able to pay this amount, so the motel owner would not give him the dogs back. He stated that due to the motel owner's actions, the dogs did not have food or water for four days. Since the dogs were locked up in the hotel rooms, he was not able to provide food and water for them. As a result, some of the dogs were in poor health. He took two of the dogs to the veterinarian who wanted to charge him $300 to put them down. Mr. Yates was not able to afford more veterinarian care, and the police took the dogs. Mr. Yates stated that he had contacted the U-Haul franchise, where he had rented the truck for one month. He told them that he could not pay them. He stated he did not steal the truck, but had kept it longer than he could afford to pay for." Yates thus appears to have falsely informed Dr. Jones that a motel owner (but never Yates) starved the dogs for four days, the dogs were alive when confiscated by the police, and the only issue with the U-Haul was that Yates was accused of stealing it when he merely could not pay the rent. And nothing in the report indicates that Yates told Dr. Jones anything about the cats in the storage unit.

4

defendant would have obtained a better outcome but for counsel's failings." (Maj. opn., *ante*, at pp. 24-25.) For all of the reasons already discussed, I do not find that sentence persuasive. The charged offenses were abhorrent, the evidence in mitigation was weak, the evidence in aggravation was strong, defense counsel forcefully argued for leniency, and the court imposed only 5 years and 8 months of incarceration for 20 felonies. On this record there is no reasonable probability that Yates would have done any better if counsel had asked for concurrent sentences.

The majority opinion also expresses concern about California Rules of Court, rule 4.425(a), which lists factors to be considered in deciding between concurrent and consecutive sentences. (Maj. opn., *ante*, at p. 23.) In particular, the majority opinion observes that Yates's criminal conduct appears to have been a "continuous course of neglect rather than multiple specific and individual acts of abuse." (*Id.* at p. 24.) But the relevant factor identified in the Rules of Court is whether "[t]he crimes were committed at different times or separate places, rather than being committed so closely in time and place *as to indicate a single period of aberrant behavior*." (Cal. Rules of Court, rule 4.425(a)(3), italics added.) The evidence in the record establishes that the charged offenses were anything but a single period of aberrant behavior. The cats were discovered in June 2017, the dogs were discovered in February 2018, Yates had a prior conviction for animal cruelty, and while out on bail for the present offenses he was arrested for abusing another 50 animals.

Moreover, rule 4.409 of the California Rules of Court provides that all relevant sentencing factors "will be deemed to have been considered unless the record

5

affirmatively reflects otherwise." Nothing in the record affirmatively indicates that the trial court failed to consider any relevant factor.

For all of the foregoing reasons, I do not believe that Yates has shown that he was prejudiced by his trial counsel's failure to request concurrent sentences. I therefore respectfully dissent from Part B of the majority opinion's Discussion and from the vacatur of Yates's sentence. I concur in the remainder of the majority opinion and the remainder of the judgment.[2]

MENETREZ _____<br>J.

---

[2] The People concede that the matter should be remanded for the trial court to reconsider imposition of certain fees because of Yates's inability to pay, and I agree.